IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

NATHANIEL ALLEN LINDELL,

                     Plaintiff,

        v.

RICHARD SCHNEITER, GARY BOUGHTON,
PETER HUIBREGSTE, RICK RAEMISCH,
SANDRA HAUTAMAKI, ELLEN RAY,
GERALD BERGE, CAPTAIN MONICA HORNER,
THOMAS CRAVENS and SGT. STEVEN WRIGHT,[1]

                     Defendants.

OPINION and ORDER

3:06-cv-608-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This is a civil action for monetary relief brought under 42 U.S.C. § 1983.  Plaintiff Nathaniel Lindell, a Wisconsin state inmate housed at the Wisconsin Secure Program Facility, contends that defendants violated his Eighth Amendment rights by depriving him of sunlight and requiring him to wear unsanitary clothing and violated his First Amendment rights by placing him in Long Term Administrative Confinement in retaliation for filing grievances and lawsuits.

---

[1]Several defendants were dismissed at screening.  I have amended the caption accordingly.

Plaintiff has filed a partial motion for summary judgment addressing the merits of his Eighth Amendment claims only.  Defendants have filed a motion for summary judgment on the merits of all of plaintiff's claims and on their defense that plaintiff has failed to exhaust his administrative remedies with respect to his sunlight deprivation claim.  Those cross motions are now before the court.

Because plaintiff has failed to adduce sufficient evidence that his lack of sunlight and exposure to contaminated clothing pose a substantial risk to his health, I will grant defendants' motion for summary judgment and deny plaintiff's motion on plaintiff's Eighth Amendment claims.  In addition, because plaintiff has failed to adduce sufficient evidence that defendants Gary Boughton and Peter Huibregste had a retaliatory motive for their acts, defendants' motion for summary judgment on plaintiff's First Amendment retaliation claim will be granted as to those defendants.  However, plaintiff has adduced evidence that, viewed in the light most favorable to him, is sufficient to establish that defendants Captain Monica Horner and Thomas Cravens had a retaliatory motive for their acts; therefore, defendants' motion for summary judgment on plaintiff's First Amendment retaliation claim will be denied as to defendants Horner and Cravens.

In addition, plaintiff has filed a motion to strike portions of defendants' expert reports and two motions for sanctions.  Because the portions of the expert reports had no adverse effect on plaintiff's claims, I will deny plaintiff's motion to strike.  Also, I will deny

2

plaintiff's motion for Rule 11 sanctions because they are not appropriate under the present circumstances.

Among the approximately 350 proposed findings of fact, many of which are irrelevant or cumulative, I find the following facts to be material and undisputed.

UNDISPUTED FACTS

A. Parties

Plaintiff Nathaniel Allen Lindell is a prisoner confined at the Wisconsin Secure Program Facility. From February 28, 2001 until the present, plaintiff has remained in the facility except for a stay at the Wisconsin Resource Center from May 21, 2002 until July 9, 2002.

B. Sunlight Deprivation

1. Exhaustion of administrative remedies

In early April 2004, plaintiff filed complaint WSPF-2004-10685, in which he stated that he had a skin rash that Dr. Cox had examined, that Dr. Cox had told plaintiff that "sunlight would probably help," but that he could not "prescribe sunlight." In his complaint, plaintiff sought "daily sun exposure" as relief and pointed out that "denial of sunshine is well-known for being the cause of all sorts of physical and mental illness." Defendant Ray

3

recommended that the inmate complaint be dismissed on April 8, 2004, noting that the facility was building outdoor recreation areas and that "inmate Lindell will have the opportunity to be out in the sunshine." The inmate complaint was dismissed on April 9, 2004.

Plaintiff appealed the complaint on April 14, 2004, contending that "WSPF should never have been opened until adequate recreation facilities were available, now I'm sick from lack of sun-exposure." About one week later, defendant Raemisch denied plaintiff's appeal of the dismissal.

2. Plaintiff's exposure to sunlight

Plaintiff is eligible for two 75-minute outdoor exercise periods each week and an additional two hours and thirty minutes of indoor exercise time each week. However, on occasion, facility officials cancel exercise for the day with no make-up day, whenever they claim to have an emergency or when it is foggy or storming.

The only sun exposure plaintiff receives is at outdoor exercise. When he is in Foxtrot, Delta and Echo units, plaintiff receives direct sunlight only by standing up at the far end of the exercise cage during outdoor exercise, where he can receive direct sunlight to the upper half of his body.

Prisoners on Phase Green can spend more hours a week at outdoor recreation than

4

other prisoners.  Since being at the facility, plaintiff has never been allowed above Phase Red.  In addition, prisoners serving disciplinary segregation are not eligible to be on Phase Green.  Plaintiff is usually serving disciplinary segregation time.

Usually, plaintiff does not exercise outdoors because he is too tired or feels too ill.

3.  <u>Mental and physical health concerns related to sunlight</u>

Although the relationship between sunlight and mental health functioning remains unclear, it has been suggested through research that a lack of sunlight can contribute to the emergence of a condition known as seasonal affective disorder.  Symptoms affiliated with seasonal affective disorder are varied and include loss of energy, social withdrawal, anxiety, increased sleep and sleepiness, overeating, weight gain and concentration difficulties.  However, the hallmark symptom affiliated with the condition is depression.  Seasonal affective disorder has been affiliated with a lack of sunlight.

Plaintiff was diagnosed with an "Affective Disorder" in February 2002, and then sent to the Wisconsin Resource Center.  (The parties dispute whether plaintiff was sent to the center for "sunshine therapy," as plaintiff contends.)  While in the resource center, plaintiff went outside to exercise as much as he could.  Over time, plaintiff found himself "keeping to himself" less and feeling less paranoid and in a better mood.  In addition, a chronic pain in his face and his shoulder was greatly reduced.  This pain increased again once plaintiff was

5

returned to the Wisconsin Secure Program Facility.

On March 28, 2006, Randy Gage diagnosed plaintiff with polysubstance dependence, anxiety disorder, dysthymic disorder and a personality disorder with antisocial and paranoid traits.  On June 11 and October 1, 2007, Charles E. Yunghans diagnosed plaintiff with chronic post-traumatic stress disorder, parasomnia by history, polysubstance dependence in remission and mixed personality disorder with antisocial and paranoid features.  Plaintiff has been given fluoxetine while at the facility.  He has a history of bi-polar disorder and is currently diagnosed by the facility's clinical staff as having Post Traumatic Stress Disorder and Anxiety Disorder.

Sunlight may have an effect on Vitamin D levels in human blood.  Plaintiff's blood was drawn on September 12, 2007 and tested for levels of Vitamin D125-Hydroxy and found to be 18.2 ng/mL.  32.0 ng/mL is deemed the lower threshold of the level needed for optimal health.  Dr. Cox signed the lab report. Defendants admit that this blood level of Vitamin D is "low."  Dr. Cox ordered plaintiff a Vitamin D supplement (fish oil) that he has been taking for months.


C.  Unsanitary Outdoor Clothing

While prisoners are participating in outdoor exercise in the Delta Unit (where plaintiff is housed), they must be fully clothed in their prison uniforms.  The prisoners must

share the outdoor exercise clothing they are provided, which includes a vest, hat, coat and gloves.

There are four tiers/halls in each unit.  At the end of each tier/hall, there are usually two outdoor exercise cages and two sets of hat, gloves and coat hung from a hook or tossed on the floor.  Any prisoner who uses the outdoor exercise cages will use these sets of cold weather clothing and then leave the clothing there for the next prisoner.

In Delta Unit, it is the general policy to have the recreation vests, coats, hats and gloves worn by the inmates sent to the institution laundry once each week.  The normal procedure for washing inmate laundry is that once the clothes are delivered to the laundry, they are washed and dried and then returned to the unit from where they came.

Plaintiff has noticed that the orange vest, hats, gloves and coat given to prisoners going outside smell musty and contain the residue of body fluids and sweat.  The appearance of the clothing has caused plaintiff to forgo outside exercise in the winter.  Some prisoners wipe their nose or other body fluids on exercise clothing at outdoor exercise.  Prisoners are not allowed to take other materials outside such as towels or tissue paper, so they have nothing else with which to wipe sweat or mucus other than their clothing.  Plaintiff has never seen staff take the outdoor exercise clothing away to be laundered.

As a general policy, inmate clothing or linen soiled with bodily fluids or other sources of contamination is designated as biohazard.  According to Wisconsin Secure Program

7

Facility Policy 182.01, contaminated linen is defined as "laundry that has been soiled with blood or other potentially infectious materials," human body fluids including semen, vomit, saliva, any body fluid that is visibly contaminated with blood and all body fluids in situations in which it is difficult or impossible to differentiate between body fluids.

Biohazard items are sent directly to the laundry immediately after the contamination incident occurs.  This laundry is placed into a water soluble bag, which is placed into a plastic yellow bag labeled "Biohazard/Infectious Linen" or "Contaminated" on the outside of the bag.  The yellow bag is tied off and transported to the laundry room for decontamination and processing.  Staff remove the water soluble bag from the outer bag and place it into the washer to be laundered separately.  The water soluble bag dissolves during the washing cycle.

Plaintiff has told staff that his towels, blankets and clothing have his blood or body fluids on them and staff have ignored his suggestion that they be treated as biohazard.

According to the facility policy, inmates with some types of skin infection do not use the community recreation clothing.  Plaintiff has had open surgical wounds, ringworm and psoriasis/nummular dermatitis, but plaintiff still had to use community clothing.  When plaintiff requested fresh clothing because he had open sores, he was denied them.

Some prisoners have infectious diseases, including HIV, flu virus, cold virus, MRSA, herpes, H. Pylori and strains of hepatitis.

8

Defendants Schneiter, Ray, Huibregste, Hautamaki and Raemisch know that at least six other complaints have been filed by facility prisoners concerning recreation clothing not being washed or being contaminated with body fluids.  Defendant Ray reviewed five of these complaints, rejecting one and dismissing the other four.

### D.  Retaliation

On February 28, 2006, defendant Schneiter testified in a separate case that plaintiff had brought in this court, Case No. 05-C-004-C.  Plaintiff cross-examined Schneiter aggressively, exposing Schneiter's lack of knowledge of plaintiff's claim for the seizure of his magazine.  Defendants were denied their motion for judgment as a matter of law.

On March 1, 2006, plaintiff was told he would have his "phase" assessed for a new program in which inmates were assigned to either one of three phases in a program called the High Risk Offender Program or placed in a status called Long Term Administrative Confinement.  Inmates in confinement are not given the same opportunities to attend programs and are subjected to more restraints and less out-of cell movement than inmates in certain phases of the High Risk Offender Program.

About two weeks before "grilling" defendant Schneiter on the stand, plaintiff had received notice that he had "tentatively been designated as Phase: Yellow" in the High Risk Offender Program.  In addition, on about February 21, 2006, defendants Horner and

9

Cravens came down separately to discuss with plaintiff what phase he would be put on. During plaintiff's conversations with defendants Horner and Cravens each had assured plaintiff that in spite of his gang membership and violent record, he had positive behavior and goals, and "neither saw any reason why [he] should not be put on Phase Yellow."

However, two days after plaintiff "grilled" defendant Schneiter, defendant Cravens prepared a Risk Assessment Information Guide in which he recommended that plaintiff be placed in Long Term Administrative Confinement.  The assessment guide represented the recommendation of the "unit team" for plaintiff's housing unit, which consisted of a Unit Manager, Security Supervisor, Social Worker, Unit Sergeants and Officers and staff from Psychological Services, Health Services, Education and Programming.   Among other comments about plaintiff, under "Impulse Control," the guide states, "historically negative, been quiet on the unit.  spends most of his time to do legal work."  In addition, the guide states under "Offender History" that plaintiff had been charged and convicted of two counts of escape from jail, First Degree Intentional Homicide, arson and burglary and had received conduct reports for Battery, Threats, Group Resistance and Petitions, Disobeying Orders, Disrespect, Disruptive Conduct, Unauthorized Forms of Communications, Damage or Alteration of Property, Misuse of State or Federal Property, Unauthorized Transfer of Property, Possession of Contraband Miscellaneous, Disfigurement and Violations of Policy and Procedures.  Finally, the guide noted that plaintiff's most recent conduct report was

10

related to plaintiff's affiliation with the Aryan Circle, a "Security Threat Group."

Defendant Cravens approved of the assessment guide on March 2, 2006, defendant Horner approved of the assessment guide on March 3, 2006 and defendants Boughton and Huibregste approved of the Unit Team's recommendation to place plaintiff in confinement on March 6, 2006.

On March 6, 2006, plaintiff was present at a Delta Unit meeting at which defendants Horner and Cravens told plaintiff that he was being put on Long Term Administrative Confinement.  When plaintiff asked why, the unit team's crisis intervention worker, Ms. Shannon-Sharpe, told plaintiff, "You spend all your time writing complaints and lawsuits opposing our program, that's our main problem," or something to that effect.  (Defendants attempted to dispute this fact by simply stating "Disputed but immaterial."  Defendants were mistaken about the materiality of the fact and have failed to properly dispute the fact by "stat[ing their] version of the fact and refer[ring] to evidence that supports that version." Procedure to Be Followed on Motions for Summary Judgment, II.D.2., attached to Preliminary Pretrial Conference Order (February 23, 2007), dkt. #13.)  "The court will not consider any factual propositions made in response to the movant's proposed facts that are not supported properly and sufficiently by admissible evidence." Procedure, II.E.  Therefore, for the purpose of summary judgment, this fact must be considered undisputed.)  When plaintiff responded that he had a right to do that, defendant Horner told plaintiff that he

11

could make better use of his time by taking programs.

On March 9, 2006, plaintiff sent a memo to defendant Horner objecting to the March 2, 2006 assessment guide.  About one week later, defendant Horner came to plaintiff's cell and discussed his memo, telling plaintiff that he was not compliant because he spent most of his time doing legal work and filing grievances.  She pointed out that "it didn't help the way [plaintiff] treated the warden on the stand."  Plaintiff asked what he needed to do to get in the program and defendant Horner replied, "Are you going to stop suing us?"  Plaintiff replied "I might as well."  Then defendant Horner said, "Then I'm sure you'll do better in the program."  (Again, defendants have attempted to dispute these proposed facts but failed to follow proper procedure, so the facts are considered undisputed for the purpose of summary judgment.)

Plaintiff was in confinement from March 6, 2006 until August 6, 2006.  As with plaintiff's March recommendation, in April, May and June 2006 the team recommended plaintiff's continued placement in confinement.  The April 2006 recommendation contained language under "Impulse Control" that was nearly identical to the language in the March 2006 recommendation:  "historically negative, been quiet on the unit.  spends most of his time doing legal work."

On July 28, 2006, defendant Cravens signed off on the Unit Team's recommendation that plaintiff be removed from Long Term Administrative Confinement and placed into

12

Phase Red in the High Risk Offender Program.  The team noted that plaintiff had shown marked improvement in his impulse control, his attitude had been appropriate and his motivation was improved because he wanted to become involved in programming available in the High Risk Offender Program.

On July 31, 2006 and August 3, 2006, defendants Boughton and Huibregste approved plaintiff's enrollment into Phase Red of the program following the team's recommendations.  All four of the named defendants are aware of plaintiff's history of lawsuits and grievances against staff members of the faciltiy.  Plaintiff has sued defendant Huibregste five times in this court and defendant Boughton four times in this court.

Another prisoner at the Wisconsin Secure Program Facility, Ronald Dennis, was put on Phase Green at the time that plaintiff was put on Long Term Administrative Confinement.  Dennis has been convicted of killing a cell mate, stabbing a prison guard and escaping from prison while in prison and is labeled a member of the Aryan Brotherhood.

DISCUSSION

A.  Eighth Amendment Claims

The Eighth Amendment imposes duties upon prison officials, among them the duties to "take reasonable measures to guarantee" the inmates' safety,  Farmer v. Brennan, 511 U.S. 825, 833 (1994), and "ensure that inmates receive adequate . . . medical care." Estelle

13

v. Gamble, 429 U.S. 97, 104-05 (1976).  Under the amendment, a prison official may not act with "deliberate indifference" to a prisoner's health and safety needs.   Farmer, 511 U.S. at 834.  Plaintiff contends that various defendants violated the amendment by depriving him of necessary sunlight and requiring him to wear contaminated clothing.

To establish that each defendant acted with deliberate indifference to his health, plaintiff must show that (1) he faced a substantial risk of serious harm or an excessive health risk and (2) each defendant knew of that risk, or was aware of facts from which that substantial risk of serious harm could be inferred and drew that inference and (3) disregarded that risk nonetheless.   Brown v. Budz, 398 F.3d 904, 913 (7th Cir. 2005) (citing Farmer, 511 U.S. at 838); Gutierrez v. Peters, 111 F.3d 1364, 1369 (7th Cir. 1997).

1.  Sunlight deprivation

Plaintiff is mistaken that his sunlight deprivation claim includes a challenge to the limitations of his ability to get "fresh air [and] outdoor exercise."  Plaintiff's first amended complaint lists harms caused by denial of sunlight only, and that is the claim on which he was allowed to proceed in this court's November 13, 2006 screening order.

a.  Exhaustion of administrative remedies

Under 42 U.S.C. § 1997e(a), a prisoner may not bring a § 1983 action such as this

14

one "until such administrative remedies as are available are exhausted."  "The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance," which requires that the grievant "compl[y] with the system's critical procedural rules."  Woodford v. Ngo, 126 S.Ct. 2378 (2006).  In addition, the grievance must "contain the sort of information that the administrative system requires."  Strong v. David, 297 F.3d 646, 649 (7th Cir. 2002).  An administrative system may impose pleading requirements more strict than mere "notice-pleading."  Id.  However,

> When the administrative rulebook is silent, a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.  As in a notice-pleading system, the grievant need not lay out the facts, articulate legal theories, or demand particular relief.  All the grievance need do is object intelligibly to some asserted shortcoming.

Strong, 297 F.3d at 650.  Because plaintiff's claim is that defendants were deliberately indifferent to his health by denying him access to adequate amounts of sunlight, at the very least plaintiff's complaint must inform prison officials that he believes his sunlight deprivation is harming his health.   Complaint WSPF-2004-10685 satisfies these requirements because it contained plaintiff's request for "daily sun-exposure," his assertion that a doctor had told him that "sunlight would probably help" plaintiff's skin rash but refused to prescribe sun exposure and his contention that "denial of sunlight is well-known for being the cause of all sorts of physical and mental illnesses."

In denying that plaintiff's complaint did not satisfy the exhaustion requirements for

15

plaintiff's present sunlight deprivation claim, defendants argue that the complaint was brought three years ago before inmates had any access to sunlight and defendants could have believed the subsequent construction of an outdoor recreation facility was "responsive" to plaintiff's complaint.  However, plaintiff's complaint was not premised on the belief that he needed only some sunlight, but that he needed daily sunlight.  Regardless whether defendants' later provision of some sunlight was adequate, plaintiff's request for daily sunlight for a rash and his assertion that "denial of sunlight is well-known for being the cause of all sorts of physical and mental illnesses" was sufficient to alert defendants to plaintiff's present claim.

b.  Merits

The Eighth Amendment "imposes duties" on prison officials to "provide humane conditions of confinement," Hudson v. Palmer, 468 U.S. 517, 526-27 (1984), and provide for the inmates' "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 199-200 (1989).  Although direct sunlight itself does not appear to be a "basic human need," a plaintiff may establish that sunlight is a necessary element to his physical or psychological health, or that lack of sunlight otherwise exposes him to a substantial risk of serious harm. Compare Jones v. Diamond, 594 F.2d 997 (5th Cir. 1979) (stating in dicta that confinement

16

without outdoor exercise may violate Eighth Amendment if inmate has serious medical need for such exercise) with Richard v. Reed, 49 F. Supp. 2d 485 (E.D. Va. 1999) (allegations that jail officials deprived prisoner of direct sunlight for more than 100 days did not state Eighth Amendment claim).

To succeed on his claim, plaintiff was required to show that in limiting his access to sunlight to 2½ hours a week, defendants were deliberately indifferent to a serious medical need, Estelle v. Gamble, 429 U.S. 97, 103 (1976) or to a "substantial risk of serious harm." Brown, 398 F.3d at 913.


### 1) deliberate indifference to a serious medical need

"Serious medical needs" encompass conditions that are life-threatening or that carry risks of permanent serious impairment if left untreated, those that result in needless pain and suffering when treatment is withheld and those that have been diagnosed by a physician as mandating treatment. Gutierrez, 111 F.3d at 1371-73. The need to treat a serious mental illness can qualify as a serious medical need. Sanville v. McCaughtry, 266 F.3d 724, 734 (7th Cir. 2001) (citation omitted). An official's "deliberate indifference" to those needs means that the official was "subjectively aware of the prisoner's serious medical needs and disregarded an excessive risk that a lack of treatment posed" to his health. Wynn v. Southward, 251 F.3d 588 (7th Cir. 2001).

17

Plaintiff contends that defendants could have offered plaintiff more sunlight to treat the several physical and mental health conditions with which he has been diagnosed, including Vitamin D deficiency, bipolar disorder, dysthymic disorder and post-traumatic stress disorder.  It is apparent through plaintiff's own concessions that he received or is receiving some treatment for all of these illnesses.  For Vitamin D deficiency, plaintiff is receiving vitamin supplements.  For dysthymic disorder, bipolar disorder and post-traumatic stress disorder, plaintiff has seen therapists and has been prescribed fluoxetine.

Plaintiff must do more than show that a form of treatment he would like to receive would be more effective than the treatment he is receiving.  A plaintiff hoping to establish deliberate indifference to a serious medical need who has received medical care addressing his health care needs must show that the treatment he received was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" plaintiff's serious medical condition.  Snipes v. DeTella, 95 F. 3d 586, 592 (7th Cir. 1996).  Mere disagreement with a doctor's medical judgment, Edwards v. Snyder, 478 F.3d 827, 831 (7th Cir. 2007), inadvertent error, negligence, malpractice or even gross negligence in providing treatment is insufficient to establish deliberate indifference.  Washington v. LaPorte County Sheriff's Dept., 306 F.3d 515 (7th Cir. 2002).

We are now at summary judgment, where plaintiff was required to "come forward with specific facts that would support a jury's verdict in [his] favor."  Van Diest Supply Co.

18

v. Shelby County State Bank, 425 F.3d 437, 439 (7th Cir. 2005).  However, plaintiff has adduced no evidence that his treatment for these illnesses is "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" his illnesses.  To do so, plaintiff could have produced expert reports demonstrating the connection between his illnesses and the lack of sunshine and the blatant inappropriateness of the doctors' present treatment for these illnesses.

Aside from those illnesses with which plaintiff has been diagnosed, he asserts that he suffers from seasonal affective disorder.  However, plaintiff has failed to adduce any evidence that he suffers from that illness.  Plaintiff does assert that he was diagnosed with an "affective disorder" in 2002 and was ordered to receive "sunlight therapy" at the Wisconsin Resource Center.  This alone is not sufficient to establish that he ever suffered from *seasonal* affective disorder or that he was given "sunlight treatment" because sunlight deprivation was the cause of his "affective disorder" or sunlight the necessary cure for it.  At most, it suggests that someone thought sunlight was an effective treatment for whatever illness plaintiff was suffering.  (To the extent that plaintiff is seeking a diagnosis from this court that he suffers from seasonal affective disorder, he is in the wrong forum.  A court has no ability to diagnose diseases, and seasonal affective disorder is not a condition "so obvious that even a layperson would perceive" it.  Edwards, 478 F.3d at 830-31 (citations omitted).)

19

2) deliberate indifference to a substantial risk of serious harm

In addition, plaintiff contends that defendants were deliberately indifferent to a "substantial risk of serious harm" because the lack of sunlight caused or aggravated his physical and mental illnesses.  It would not be enough for plaintiff to show that sunlight deprivation *may* cause or aggravate certain illnesses; instead, the risk must be at least highly likely.  Brown, 398 F.3d at 911.  Although plaintiff asks the court to take judicial notice of several facts related to the effect of sunlight on physical and mental health, I cannot take judicial notice of the critical fact, which is that sunlight deprivation is highly likely to cause or aggravate any of the illnesses plaintiff discusses.  Such a fact is hardly "indisputable." Hennessy v. Penril Datacomm Networks, Inc., 69 F.3d 1344, 1354 (7th Cir. 1995) (fact must be indisputable to be subject to judicial notice).  Moreover, plaintiff offers no admissible evidence (such as an expert report) on the likelihood that sunlight deprivation causes or aggravates any mental or physical illnesses.  Therefore, plaintiff has failed to adduce sufficient evidence to establish that sunlight deprivation poses a substantial risk to his health.

Because plaintiff has failed to adduce sufficient evidence to establish either blatant mistreatment or an excessive risk to his health caused by sunlight deprivation, defendant's motion for summary judgment will be granted and plaintiff's motion will be denied on plaintiff's claim that defendants Wright, Berge, Ellen Ray, Huibregtse, Huatamaki and

20

Raemisch exhibited deliberate indifference to his health by denying him access to adequate amounts of sunlight.

2. <u>Unsanitary outdoor clothing</u>

Plaintiff's second claim is that defendants Schneiter, Ellen Ray, Huibregtse, Hautamaki and Raemisch violated his rights under the Eighth Amendment by promulgating and enforcing policies that require him to wear clothing contaminated with other inmates' bodily fluids.  Defendants contend that there is not enough evidence to establish that contaminated clothing poses a substantial risk of serious harm to plaintiff, and that the facility's policies governing the washing of laundry on Delta Unit insure that inmates are not exposed to contaminated clothing.

Plaintiff denies that defendants exercise their official laundry policies and treat biohazard materials appropriately.  Even assuming that plaintiff is correct and defendants were lax in enforcing their policy, plaintiff has failed to establish that he faces any substantial risk.  To prevail on his claim, plaintiff would have to show that his exposure to contaminated clothing put him at "substantial risk of serious harm."  <u>Brown</u>, 398 F.3d at 913.  For a risk to be "substantial," it must be highly likely to materialize, if not "almost certain."   <u>Id.</u> at 911.  Thus, to survive summary judgment on this claim, plaintiff was required to "come forward with specific facts" sufficient to establish that his having to wear contaminated

clothing exposed him to serious health risks that were highly likely to materialize.  Van Diest
Supply Co., 425 F.3d at 439.     Although plaintiff asks the court to take judicial notice
of several facts related to the transmission of infectious diseases and their functions, I cannot
take judicial notice of the critical allegation, which is that exposure to outdoor clothing
contaminated with dried body fluids exposes a person to a health risk that is highly likely to
materialize.  As with plaintifff's claim of sunlight deprivation, he has failed either to submit
expert reports showing the likelihood of contracting infectious diseases from outdoor
clothing or show that the likelihood is "obvious."

In the absence of evidence that wearing soiled outdoor clothing exposes plaintiff to
a substantial risk of serious harm, defendants' motion for summary judgment will be granted
on this issue and plaintiff's motion will be denied.

## B.  First Amendment Retaliation Claim

Plaintiff's final claim is that defendants Horner, Cravens, Boughton and Huibregste
violated his First Amendment rights by delaying his admission to the High Risk Offender
Program in retaliation for his filing of lawsuits and grievances.  A prison official who takes
adverse action against a prisoner in retaliation for a prisoner's exercise of a constitutional
right violates the First Amendment.  Babcock v. White, 102 F.3d 267, 275 (7th Cir. 1996).
Even otherwise lawful action violates the constitution if it is "taken in retaliation for the

exercise of a constitutionally protected right."  DeWalt v. Carter, 224 F.3d 607, 618 (7th Cir. 2000).

The Supreme Court has established a two step burden-shifting analysis for retaliation claims.  Mt. Healthy Board of Education v. Doyle, 429 U.S. 274, 287 (1977).  In the first step, plaintiff must establish that his "protected activity was a motivating factor in the defendant's retaliatory action."  Id.; see also Spiegla v. Hull, 371 F.3d 928, 942 (7th Cir. 2004).  However, he need not establish that the activity was the only factor, or even a "but-for" factor.  Spiegla, 371 F.3d at 942-43.  At that point, the burden shifts to the defendant to show that he would have taken the same action even if plaintiff had not engaged in the protected conduct.  Mt. Healthy, 429 U.S. at 287; Spiegla, 371 F.3d at 943.

In the context of defendant's summary judgment motion, the Mt. Healthy burden-shifting analysis means that plaintiff may survive summary judgment if he has adduced sufficient evidence to establish that his protected activity of filing lawsuits and grievances was a motivating factor in defendants' decision to recommend and place him in Long Term Administrative Confinement, unless the undisputed evidence also establishes that defendant would have taken the same action even if plaintiff had not engaged in the protected conduct.  Mt. Healthy, 429 U.S. at 287; see also Lewis v. Casey, 518 U.S. 343, 351 (1996) (inmates have right of access to courts); Walker v. Thompson, 288 F.3d 1005, 1009 (7th Cir. 2002) (grievances may be protected by right to petition, right to free speech or right of access to

23

courts).

1.  Plaintiff's burden to establish that filing of lawsuits and grievances was a motivating factor

Although a defendant rarely admits to retaliatory motives, plaintiff submits evidence of the"smoking gun" sort against two of the defendants.  As to defendant Horner, who signed the first recommendation that plaintiff be placed in Long Term Administrative Confinement, plaintiff has adduced evidence that she came to his cell about a week after the decision and told him that he was not compliant because he spent most of his time doing legal work and filing grievances, and added that, "it didn't help the way [plaintiff] treated the warden on the stand," indicating that he would do better in the program when he stopped suing defendants.  From this exchange, a jury could find that defendant Horner was motivated by plaintiff's filing of lawsuits and grievances when she recommended that he be placed in Long Term Administrative Confinement.

Next, defendant Cravens, who signed plaintiff's initial recommendation as well as later recommendations, was present at a Delta Unit meeting in which defendants Horner and Cravens first told plaintiff that he was being put on Long Term Administrative Confinement.  When plaintiff asked why he was being put on confinement, Shannon-Sharpe told plaintiff something to the effect that "you spend all your time writing complaints and

24

lawsuits opposing our program, that's our main problem."  Because Shannon-Sharpe's statement could be viewed as a statement reflecting the motivations behind the entire Unit Team, and because defendant Cravens was in the room but did not object to Shannon-Sharpe's statement or clarify it in any way, a jury could find that defendant Cravens was motivated to recommend confinement because of plaintiff's filing of lawsuits and complaints.

Thus, with respect to defendants Horner and Craven, plaintiff has met his initial burden under Mt. Healthy.  I should note that this does not mean that jail officials are never allowed to consider a prisoner's protected behavior as a relevant factor for making decisions within the setting of prison.  Where prison officials "proffer legitimate penological reasons" for allegedly retaliatory conduct, the court should afford the officials the appropriate deference and flexibility.  Babcock, 102 F.3d at 275.  Defendants do not assert a legitimate penological interest for holding plaintiff's litigious behavior against him in the setting of prison rehabilitation, although there very well may be one, because they do not admit that they held this behavior against him at all (instead they simply failed to properly dispute the relevant facts).

As for the other two defendants, plaintiff has offered no direct proof of their retaliatory motive.  However, plaintiff may rely on circumstantial evidence, such as suspicious timing or statements by a respondent suggesting that he was bothered by the protected conduct.  E.g., Mullin v. Gettinger, 450 F.3d 280, 285 (7th Cir. 2006); Culver v.

25

Gorman & Co., 416 F.3d 540, 545-50 (7th Cir. 2005).

Plaintiff adduces no evidence that defendants Boughton and Huibregste ever knew of the "smoking gun" statements or approved of them. He suggests no reason to believe that either defendant would be particularly bothered by plaintiff's recent aggressive questioning of defendant Schneiter in another case. Thus, even though defendants made their adverse decisions shortly after plaintiff "grilled" defendant Schneiter, it would be sheer speculation to infer retaliatory motive from these facts. Sauzek v. Exxon Coal USA, Inc., 202 F.3d 913, 918 (7th Cir. 2000) ("[S]peculation based on suspicious timing alone . . . does not support a reasonable inference of retaliation . . . . Rather, other circumstances must also be present which reasonably suggest that the two events are somehow related to one another.").

Defendants' retaliatory motive cannot be inferred from nearly identical statements on the March and April assessment guides signed by both defendants Boughton and Huibregste. In these statements, the author noted that plaintiff "spends most of his time to do legal work." However, defendants Boughton and Huibregste would have to have understood this comment to be a criticism of plaintiff's use of time doing legal work. The comment is found in a section on "Impulse Control" and follows a positive comment that he has "been quiet on the unit." In the context of the comment, such an understanding would be far-fetched.

Finally, plaintiff attempts to submit evidence of other "similarly situated prisoners."

26

Retaliatory motive can be proved by showing that others who were "similarly situated" to plaintiff received more favorable treatment.  Humphries v. CBOCS West, Inc., 474 F.3d 387, 404-06 (7th Cir. 2007); Scaife v. Cook County, 446 F.3d 735, 739 (7th Cir. 2006). Plaintiff would have to show that when defendants Boughton and Huibregste recommended Long Term Administrative Confinement for plaintiff, they also recommended placement in the High Risk Offender Program for other prisoners who did not file lawsuits and grievances but who did have similar disruptive conduct histories and affiliation with a Security Threat Group.

Plaintiff's only admissible evidence of "similarly situated" prisoners is testimony by Ronald Dennis that he was put on Phase Green and had a similarly troubled history and similar affiliation with a Security Threat Group.  However, there is no evidence that defendants Boughton and Huibregste were involved in placing Dennis on Phase Green.

Plaintiff has failed to meet his burden as to defendants Boughton or Huibregste because he has failed to adduce sufficient evidence to establish that either defendant had a retaliatory motive for approving his placement in Long Term Administrative Confinement.

2.  Defendant's burden to establish that they would have taken the same action

The burden now shifts to defendants Horner and Craven to establish that they would have recommended placing plaintiff in Long Term Administrative Confinement even if he

27

had not filed lawsuits and grievances.  As the movants at summary judgment, defendants are in the awkward position of carrying this burden even while the evidence is to be viewed "in the light most favorable to plaintiffs."  Schuster v. Lucent Technologies, Inc., 327 F.3d 569, 573 (7th Cir. 2003).

It is undisputed that the assessment guide recommending plaintiff's placement in confinement stated that plaintiff was responsible for several acts of misconduct and violence and was affiliated with a threat group.  Even assuming this evidence establishes that plaintiff was violent and affiliated with a security threat group, it does not establish that defendants were required to place plaintiff in Long Term Administrative Confinement given what they believed about his conduct history and affiliation.  Moreover, the "smoking gun" evidence, viewed in the light most favorable to plaintiff, suggests that defendants Horner and Craven were so concerned about plaintiff's litigious behavior that they based their decision on it. Therefore, at summary judgment, defendants cannot meet their burden.

Because plaintiff has adduced sufficient evidence that defendants Horner and Craven acted on retaliatory motives and defendants have not carried their burden of showing that they would have made the same recommendation even if he had not been a prison litigator, defendants' motion for summary judgment will be denied with respect to plaintiff's claim that defendants Horner and Craven violated his First Amendment Rights by refusing temporarily to admit him into the High Risk Offender Program in retaliation for filing

28

lawsuits and grievances.  At the same time, because plaintiff has failed to adduce sufficient evidence that defendants Boughton and Huibregste acted on retaliatory motives, defendants' motion for summary judgment will be granted as to those defendants.

### E.  Motion to Strike and Motions for Sanctions

Plaintiff has filed a motion to strike portions of defendants' expert reports addressing his Eighth Amendment claims.  Because plaintiff failed to establish that he faced a substantial risk of serious harm for either claim, defendant's expert reports were not relied upon to establish any factual dispute.  Therefore, plaintiff's motion to strike will be denied as moot.

Plaintiff has filed two motions seeking the imposition of Rule 11 sanctions on defendants for their alleged failure to "make a reasonable inquiry" to insure the truth of their proposed findings of facts and the affidavits supporting them.  The proper response to allegedly untruthful or inaccurate proposed findings of fact is to produce evidence to refute the proposals, not to seek sanctions.  In any event, plaintiff has not pointed to anything in defendants' submissions that suggests "wilfulness, bad faith or fault" on the part of defendants' counsel.  Marrocco v. General Motors Corp., 966 F.2d 220, 224 (7th Cir. 1992) (citing National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 640 (1976)).  Therefore, both of plaintiff's motions for sanctions will be denied.

29

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment is GRANTED and plaintiff's motion for summary judgment is DENIED with respect to plaintiff Nathaniel Lindell's claims that

a) defendants Sgt. Steven Wright, Gerald Berge, Ellen Ray, Peter Huibregste, Sandra Hautamaki and Richard Raemisch exhibited deliberate indifference to his health by denying him access to adequate amounts of sunlight;

b) defendants Richard Schneiter, Ellen Ray, Peter Huibregste, Sandra Hautamaki and Richard Raemisch exhibited deliberate indifference to his health by promulgating and enforcing policies that require him to wear clothing contaminated with other inmates' bodily fluids; and

c) defendants Gary Boughton and Peter Huibregste violated his rights under the First Amendment by refusing temporarily to admit him to the High Risk Offender Program in retaliation for his filing lawsuits and grievances;

2. Defendants' motion for summary judgment is DENIED with respect to plaintiff Nathaniel Lindell's claim that defendants Captain Monica Horner and Thomas Cravens violated his rights under the First Amendment by delaying his admission to the High Risk Offender Program in retaliation for his filing lawsuits and grievances;

3. Plaintiff's motion to strike defendant's expert reports is DENIED; and

30

4.  Both of plaintiff's motions for sanctions are DENIED.

Entered this 7th day of January, 2008.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge